UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

SABRINA ELLIOTT,

                              Plaintiff,              **MEMORANDUM & ORDER**
                                                      13-CV-2673 (MKB)

              v.

CAROLYN W. COLVIN, Acting Commissioner of
Social Security,

                              Defendant.

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

       Plaintiff Sabrina Elliott filed the above-captioned action seeking review pursuant to 42

U.S.C. § 405(g) of a final administrative decision of Defendant Carolyn W. Colvin, Acting

Commissioner of Social Security ("Commissioner") denying her claim for Social Security

disability insurance benefits.  Defendant moves for judgment on the pleadings pursuant to Rule

12(c) of the Federal Rules of Civil Procedure, claiming that the decision of Administrative Law

Judge Ronald R. Bosch ("ALJ") is supported by substantial evidence and should be affirmed.

(Docket Entry No. 11.)  Plaintiff cross-moves for judgment on the pleadings, arguing that, (1) the

ALJ erred in failing to obtain additional records from Leonard Kingsley, Ph.D., Plaintiff's

treating psychologist, (2) the ALJ did not properly evaluate Plaintiff's credibility, (3) the ALJ's

finding that Plaintiff can perform the full range of light work is not based on substantial

evidence, and (4) the ALJ failed to adequately establish that there is other work in the national

economy that Plaintiff can perform.  (Docket Entry No. 14.)  For the reasons set forth below,

Defendant's motion for judgment on the pleadings is denied.  Plaintiff's cross motion for

judgment on the pleadings is granted.

## I. Background

Plaintiff is a 47-year old woman who graduated from high school, and completed thirteen credits of college education. (R. 52.) Plaintiff has a "tax training certificate," (*id.* at 53), and last worked in 2010 as a telemarketer, (*id.* at 200). Plaintiff filed for disability benefits on August 30, 2010,[1] alleging disability beginning January 15, 2010. (*Id.* at 18.) In her Disability Report, Plaintiff reported that she stopped working in July 2010 due to knee surgery, back injury, foot injury, bi-polar disorder, high blood pressure, dizziness, and gastritis. (*Id.* at 237.) On December 21, 2010, Plaintiff's application for disability benefits was denied. (*Id.* at 97–102.) Plaintiff requested a hearing by an Administrative Law Judge on February 9, 2011. (*Id.* at 107–08.) The request was granted and an administrative hearing was held before the ALJ on March 28, 2012. (*Id.* at 18.) By decision dated April 12, 2012, the ALJ found that Plaintiff was not disabled. (*Id.* at 18–27.) The Appeals Council denied review of the ALJ's decision on March 1, 2013. (*Id.* at 1–6.)

---

[1] Plaintiff was given a protective filing date of August 11, 2010. (Def. Mem. 1; Pl. Mem. 1.) A protective filing "indicates that a written statement, such as a letter, has been filed with the Social Security Administration, indicating the claimant's intent to file a claim for benefits." *Ladd v. Comm'r of Soc. Sec.*, No. 13-CV-236, 2014 WL 2779167, at *3 n.1 (N.D.N.Y. June 19, 2014) (citing 20 C.F.R. § 416.340). If the writing is properly filed, the Social Security Administration will use the date of the written statement, "the protective filing date," as the filing date of the application even if a formal application is not filed until after the writing is submitted. *Id.* If a claimant is given a protective filing date that is earlier than the application date, the availability of social security benefits is calculated from the earlier protective filing date. *See Roma v. Astrue*, No. 07-CV-1057, 2010 WL 3418165, at *1 n.1 (D. Conn. Mar. 12, 2010) ("[A]ny post-entitlement determinations involving the application filing date would use the protective filing date."); *Rodriguez v. Astrue*, No. 08-CV-1126, 2009 WL 890052, at *1 n.2 (S.D.N.Y. Apr. 1, 2009) (noting that although claimant's "application was filed on April 11, 2001, the claim was given a protective filing date of March 14, 2001, such that if [claimant] were successful . . . he would recover benefits retroactive to the earlier date").

### a. **Plaintiff's testimony**

Plaintiff testified that she experiences lower back pain, right arm numbness and pain, depression and anxiety. (*Id*. at 40, 45–46, 49.) Plaintiff rated her back pain, on a scale from one to ten, as ten "on average." (*Id*. at 40.) She described her lower back pain as a "shooting, sharp pain" and stated that the duration of the pain varies. (*Id*. at 41.) Plaintiff can sit for one or two hours before having to change positions. (*Id*.) Plaintiff estimated that she can sit for four hours with breaks, can stand for four hours with breaks and can stand for thirty minutes continuously before experiencing discomfort. (*Id*. at 42.) Plaintiff can walk for about one block before having to stop, and has trouble going up and down stairs. (*Id.* at 43.) Plaintiff has trouble walking on uneven surfaces, but over the course of an eight-hour day, can walk for up to one hour, with breaks. (*Id*. at 45, 53.) Plaintiff can climb stairs and can maintain her balance more often than not. (*Id*. at 55.) Plaintiff has trouble bending at the waist, squatting, stooping, crouching, and crawling. (*Id*. at 43–44.) Plaintiff was issued a cane that she "needed," but she did not know where it was located and was unable to replace it. (*Id*. at 44.)

Plaintiff has problems pushing and pulling with her right hand and experiences weakness in her hand. (*Id*. at 45.) Plaintiff can write with a pen or pencil. (*Id*.) When asked if she could use a computer, Plaintiff stated that she did not think that she could sit at a desk and do computer work continuously. (*Id*. at 46.) While Plaintiff initially testified that she could carry ten pounds with her right arm and five pounds with her left arm, she later indicated that her lifting limit was five pounds. (*Id*. at 46, 54.)

Plaintiff experiences depression and anxiety every day. (*Id*. at 59.) Due to her depression, she has "low tolerance" and low patience for noise, standing in line and crowds. (*Id*. at 46.) Plaintiff has "outbursts" and gets "aggressively loud" in public environments. (*Id*.

at 47.)  She stays at home to avoid public environments.  (*Id.* at 48.)  Plaintiff does not believe that she can work given that she has "no quality of life," she does not "have peace of mind at home," and is in pain.  (*Id.* at 50.)  Her depression and anxiety are exacerbated by the fact that she lives with her mother who has many health problems, including a history of mental health impairments.  (*Id.* at 48.)

Plaintiff needs help getting in and out of the tub, (*id.* at 57), but can dress herself, prepare a meal, and take public transportation independently, and perform a "little" exercise, (*id.* at 57–58).  Plaintiff cannot work around dust or in extreme cold or heat, cannot operate a motor vehicle, cannot be exposed to vibrations, noise, temperature or humidity changes, heights, moving mechanical parts or machinery.  (*Id.* at 56–57.) Plaintiff is no longer treating with a doctor.[2]  She takes a low-milligram Motrin for her pain which she explained "help[s]" with the pain but "not so much."  (*Id.* at 50.)

Plaintiff attends church and maintains hobbies.  (*Id.* at 59.)  Plaintiff does not socialize with others and spends her typical day at home.  (*Id.* at 59.)  Although Plaintiff used to have a lot of friends, she no longer has patience for people.  (*Id.* at 60.)  When passing by a group of people who are talking or laughing, she believes that the group is talking or laughing about her.  (*Id.* at 59.)

---

[2]  According to Plaintiff's counsel, Plaintiff's lack of treatment is not because of a "lack of effort."  (R. 39.)  Plaintiff has no medical coverage and is no longer able to take advantage of certain treatment clinics and services.  (*Id.* at 38.)

### b. Plaintiff's work history

Plaintiff last worked in 2010 as a telemarketer. (*Id*. at 200.) She worked in this capacity for one or two months.[3] (*Id*. at 200, 236.) Prior to her work as a telemarketer, Plaintiff worked as a paratransit bus operator from July 2009 until January 2010, and as a bus operator and property protection agent from 1997 until 2008. (*Id*. at 220.) As a paratransit bus operator, she operated a paratransit vehicle and assisted customers with bags and luggage. (*Id*. at 221.) As a bus operator and property protection agent, she operated a bus and provided security in various locations including train yards, bus depots and warehouses. (*Id*. at 222.)

### c. Medical Evidence

#### i. Treatment prior to disability onset date

The record contains documents relating to Plaintiff's medical treatment prior to the alleged onset date of her disability in January 15, 2010. These include Plaintiff's treatment records following a 2003 work injury where Plaintiff tripped over an uneven surface and hit her left knee, as well as Plaintiff's mental health treatment records.

##### 1. V. Gressel, M.D. CPMR[4] (East Shore Medical, P.C.)

Plaintiff saw Dr. Gressel of East Shore Medical, P.C. on or about December 23, 2003, for a follow-up examination of a left knee injury following a 2003 work incident.[5] (*Id*. at 265.)

---

[3] There is a discrepancy in the record as to whether Plaintiff worked as a telemarketer for one month or two months. In an undated Disability Report, Plaintiff reported working as a telemarketer for one month. (R. 238.) On a "Work Activity Report" dated August 30, 2010, Plaintiff reported working for two months as a telemarketer. (*Id*. at 200.)

[4] Dr. Gressel's first name does not appear in the administrative record.

[5] Dr. Gressel's "Follow Up Examination Report" is dated December 23, 2003, but does not indicate the date of Plaintiff's treatment. (R. 265.) Information about the 2003 work incident is not included in the records from East Shore Medical, P.C. However, during a March 11, 2005 visit to Andranik Khatchatrian, M.D., Ph.D, *see infra* Part I.c.i.2, Plaintiff reported that

Plaintiff reported that the pain in her left knee was improving but that she was experiencing "periodic episodes of clicking and lock in" which persisted despite treatment. (*Id.*) Plaintiff also reported lower back pain and stiffness and difficulties with walking and prolonged standing. (*Id.*)

Dr. Gressel reported that there was "no swelling" in Plaintiff's left knee, and that her left knee had 125 degrees of flexion and improved motor power extension. (*Id.*) Dr. Gressel stated that Plaintiff could ambulate without assistive device. (*Id.*) Dr. Gressel's physical examination of Plaintiff indicated that Plaintiff's lumbosacral range of motion was limited to 60 degrees of flexion. (*Id.*) Dr. Gressel also noted that there was a pending authorization for an MRI of Plaintiff's left knee. (Id.) Dr. Gressel diagnosed Plaintiff with a left knee derangement due to work related injury, meniscal tear/ligament rupture and lumbosacral spine derangement. (*Id.*) Dr. Gressel recommended that Plaintiff continue physical therapy three times a week, follow up in four weeks, and continue treatment with "NSAIDs."[6] (*Id.*) Dr. Gressel recommended that Plaintiff return to work under "light duty," with restrictions. (*Id.* at 266.)

### 2. Andranik Khatchatrian, M.D., Ph.D

Plaintiff saw Dr. Khatchatrian on March 11, 2005, for a second opinion for her work related injury. (*Id.* at 261–63.) Plaintiff complained to Dr. Khatchatrian of continued pain in her left knee with restricted range of motion and weakness of the left lower extremity. (*Id.* at 262.) Plaintiff further reported that she was unable to run, jump, or walk more than one block without pain, and had difficulty going up and down stairs. (*Id.*)

---

on September 13, 2003, while working as a bus cleaner, she tripped over an uneven surface and hit her left knee on the bus door hinge. (R. 262.)

[6] NSAIDs refers to "non-steroidal anti-inflammatory drugs." *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. ---, ---, 133 S.Ct. 2466, 2468 (2013)

Dr. Khatchatrian noted Plaintiff's prior medical history related to her left knee pain, including prior X-rays, which were negative for fracture or dislocation and a prior MRI, which indicated a meniscal tear. (*Id*.) Dr. Khatchatrian also noted that surgery was recommended to Plaintiff but that she declined to have surgery. (*Id*.) Plaintiff underwent physical therapy for one year, and at the time of Dr. Khatchatrian's examination had missed thirteen months of work. (*Id*.)

Dr. Khatchatrian performed a physical examination of Plaintiff's left knee and noted tenderness to palpation over the joint line with more tenderness on the medial side. (*Id*.) Dr. Khatchatrian further noted weakness of Plaintiff's left knee extension "with mild atrophy of the quadriceps muscles, mostly the vastus medialis" and "moderate restriction of active flexion of the left knee and mild restriction of active extension." (*Id*.) Dr. Khatchatrian recommended that Plaintiff continue her home exercise program and "proper care," and noted that Plaintiff was not interested in any further intervention. (*Id*. at 263.) Dr. Khatchatrian concluded that Plaintiff had a schedule loss of use of her left leg of 20% due to the September 13, 2003 work incident. (*Id*.)

### 3. Preferred Health Partners

Plaintiff visited various doctors at Preferred Health Partners (PHP) several times throughout 2005–2007, and 2009–2010 for treatment related to certain physical and mental ailments. The treatment records from PHP variably identify Dr. Anthony Ezeagbor or Dr. Mavis Polidore as Plaintiff's primary care providers. (*See e.g.*, *id*. at 278, 279, 382, 384.)

Many of Plaintiff's treatments at PHP appear to be unrelated to her current disabilities.[7] However, once in 2007 and several times throughout 2009, Plaintiff visited Dr. David Tavdy and Dr. Ezeagbor, on separate occasions, for her depression and anxiety.

### a. Dr. David Tavdy

On December 5, 2007, Plaintiff visited Dr. Tavdy for her depression. (*Id.* at 384.) She complained of symptoms of stress, depression and anxiety. (*Id.*) Dr. Tavdy described Plaintiff's depressive disorder as "chronic" and recommended that Plaintiff resume taking Zoloft 50mg and counseling and that she should follow up with her primary care physician, Dr. Ezeagbor.[8] (*Id.* at 384.)

### b. Dr. Ezeagbor

Plaintiff visited Dr. Ezeagbor several times in 2009, mostly concerning her mental health ailments. (*Id.* at 269–270, 275, 277–278.) On January 16, 2009, Plaintiff visited Dr. Ezeagbor for a "routine check up" and to have an unspecified form filled out.[9] (*Id.* at 269.) Plaintiff reported during this visit that she felt "much better but . . . [was] still stressed out." (*Id.*)

---

[7] Plaintiffs' unrelated treatment included visits to Dr. Polidore in 2005 and 2006, (R. 389–92), Dr. Roya Jafari-Hassad in April 2007, (*id.* at 386), Dr. Vinod Thukral in July 2007 and in September 2007, (*id.* at 382, 387–88), Dr. Nigel Henry in February 2009, (*id.* at 272), and Dr. Joo Song Kim in October 2009, (*id.* at 279–80). Plaintiff also saw her primary care physician, Dr. Anthony Ezeagbor on December 2009 and January 2010 for unrelated treatment. (*Id.* at 285, 287–89.)

[8] It is unclear whether Plaintiff followed up with Dr. Ezeagbor after her visit with Dr. Tavdy, as the record does not indicate that Plaintiff visited Dr. Ezeagbor until 2009.

[9] The record does not indicate the type of form Plaintiff needed to be filled out. Although the record includes certain treatment documents which were submitted in connection with Plaintiff's worker's compensation case, (*see* R. 249–267), the record related to Plaintiff's visit to Dr. Ezeagbor on January 16, 2009 is not included.

Dr. Ezeagbor noted that Plaintiff was "not yet adjusted"[10] and ordered that Plaintiff seek a follow up with a psychiatrist. (*Id*.) During this visit, Dr. Ezeagbor conducted a physical examination of Plaintiff and found that Plaintiff was in no apparent distress, was well nourished, and that her respiratory, musculoskeletal, and neurological conditions were normal. (*Id*.) Dr. Ezeagbor also classified Plaintiff's adjustment disorder with anxiety and depressive disorder as being under "fair control."[11] (*Id*.)

On February 17, 2009, Plaintiff visited Dr. Ezeagbor again for a follow up examination and to have an unspecified form filled out. (*Id*. at 270.) During this visit, Plaintiff reported feeling "depressed every now and then," and Dr. Ezeagbor classified Plaintiff's adjustment disorder with anxiety as under "fair control." (*Id*.) It appears that Dr. Ezeagbor ordered Plaintiff to continue taking Zoloft 50mg and Ambien 5mg as prescribed. (*See id.* (identifying both medications as "added or continued [at] this visit").) Dr. Ezeagbor's physical examination of Plaintiff on this date yielded normal results. (*Id*.)

On May 4, 2009, Plaintiff visited Dr. Ezeagbor again, complaining of an unrelated issue. (*Id*. at 275.) Plaintiff requested during this visit "to have her med[ication] while in a psych shelter." (*Id*.) No other information is provided in the record regarding the nature of Plaintiff's stay in a "psych shelter" or whether Plaintiff was receiving treatment at this facility. There is also no indication as to any particular medication or whether Plaintiff was still taking Zoloft 50mg and Ambien 5mg as previously prescribed. The results of Dr. Ezeagbor's physical examination of Plaintiff on this date were normal. (*Id*.)

---

[10] It is unclear whether Dr. Ezeagbor was referring to Plaintiff's mental impairment. (R. 269.)

[11] Plaintiff's "active medications" at this time were Zoloft 50mg, Ambien 5mg, Metrogel-vaginal .75% and Difflucan 150mg. (R. 269.)

On May 8, 2009, Plaintiff visited Dr. Ezeagbor regarding a "disability form" filled out. (*Id*. at 277.) Plaintiff reported not feeling depressed or anxious and being "stable." (*Id*.) Plaintiff also indicated that she was still in the shelter. (*Id*.) Dr. Ezeagbor classified Plaintiff's adjustment disorder as "stable" and the results of his physical examination of Plaintiff were normal. (*Id*.)

On June 10, 2009, Plaintiff visited Dr. Ezeagbor regarding a "disability form." (*Id*. at 278.) During this visit, Plaintiff denied any new complaint and Dr. Ezeagbor reported Plaintiff's adjustment disorder as "stable." (*Id.*) Plaintiff next visited Dr. Ezeagbor on October 22, 2009 for a check-up and to have another unspecified disability form "[r]enewed." (*Id*. at 281.) Plaintiff did not report any new complaints and Dr. Ezeagbor noted that Plaintiff's adjustment disorder had "improved," and that Plaintiff had "no emotional disturbances."[12] (*Id*.) On December 3, 2009, Plaintiff saw Dr. Ezeagbor for a follow-up visit. (*Id*. at 284–85.) At this visit, Plaintiff did not report any new complaint to Dr. Ezeagbor and was still taking Motrin 600mg and Zoloft 50mg. (*Id*. at 284.) Plaintiff's adjustment disorder was stable. (*Id*.) Dr. Ezeagbor described Plaintiff as having a history of "borderlin[e] personality" disorder.[13] (*Id*.) Dr. Ezeagbor did not provide any other details about Plaintiff's borderline personality disorder.

---

[12] Plaintiff was taking Zoloft 50mg at the time of this visit. (R. 279.) Plaintiff was also taking Motrin 600mg though the record does not indicate why Plaintiff was taking Motrin 600mg at this time or when she began taking this medication. The record also indicates that the results of Dr. Ezeagbor examination of Plaintiff's constitutional, respiratory, metabolic/endocrinological, and neurological/psychological conditions were normal. (*Id*.)

[13] This record is the earliest documentation of this diagnosis.

### 4. James P. Wolberg, M.D.

On August 14, 2008, Plaintiff visited Dr. Wolberg for an independent psychiatric evaluation, as part of her employer's review of her ability to perform her position as a security property protection agent. (*Id*. at 349.) Dr. Wolberg prepared a summary of his evaluation on this date, (*id*), which was included as part of a report prepared by New York City Transit Authority regarding a 2008 investigation by Plaintiff's employer into allegations of inappropriate behavior by Plaintiff, (*see infra* Part I.c.iii.1). Dr. Wolberg noted that Plaintiff presented with no current psychiatric symptoms, had no complaints, and did not exhibit any serious emotional or behavioral distress. (*Id*.) He observed that Plaintiff was "somewhat guarded, distrustful and defensive, but cooperative with encouragement in providing information." (*Id*.) Dr. Wolberg also noted that Plaintiff reported a psychiatric history of irritability, stress and anxiety related to conflicts at work with authority figures, and reported "episodes of angry verbal outbursts," as well as "ongoing grudges" with her supervisors who she perceived as "demeaning" towards her and who she believed engaged in other targeted behavior against her. (*Id*.) Plaintiff also reported that she was previously diagnosed with Adjustment Disorder and had been treated with Zoloft, which she reported taking regularly "with fair effect." (*Id*.)

Dr. Wolberg concluded that Plaintiff exhibited "mild to moderate non-psychotic character traits in the paranoid domain which appear to cause interpersonal and occupation conflicts at times." (*Id*.) Dr. Wolberg also noted that Plaintiff described an "ongoing pattern of distrust and suspicion, especially towards authority figures, and is quick to react loudly and angrily, which has led to previous concerns and psychiatric evaluations." (*Id*.) Because of Plaintiff's admitted past history of alcohol and cannabis use, Dr. Wolberg recommended "verification of continued abstinence from all drugs and alcohol by toxicology testing." (*Id*.)

## ii. Treatment after disability onset date

On January 14, 2010, Plaintiff was attacked by a passenger while driving a bus for work, ("January 14, 2010 work incident"). Following this incident, Plaintiff reported injuries to her head, neck and back. The record before the Court contains medical information related to Plaintiff's treatment for her physical injuries following the January 14, 2010 work incident, as well as information regarding Plaintiff's continued mental health treatment.

### 1. Brookdale University Hospital Medical Center Emergency Department

On January 15, 2010, Plaintiff went to the Brookdale University Hospital Medical Center Emergency Department ("Brookdale"). (*Id*. at 250.) Plaintiff was diagnosed with neck pain and muscle strain, prescribed Ibuprofen and discharged on the same date. (*Id*.)

### 2. Jeff J. Mollins, D.C.

Plaintiff received chiropractic treatment from Jeff Mollins, Doctor of Chiropractic ("D.C."), for an unspecified period of time for the injuries she sustained during the January 14, 2010 work incident. (*Id*. at 251.) On January 18, 2010, Dr. Mollins reported that due to her injuries, Plaintiff was "physically unable to work for an undetermined period of time." (*Id*.)

### 3. Bhim S. Nangia, M.D., DCH

On January 29, 2010, Plaintiff saw Dr. Nangia for a neurological consultation.[14] (*Id*. at 256.) Plaintiff's major complaints at the time of his examination were neck pain and stiffness radiating to both shoulders, scapular regions and upper extremities, with restriction of neck motion, numbness and tingling sensations in the right arm, forearm, hand and fingers, lower back

---

[14] Dr. Nangia's report of this consultation indicates that his examination of Plaintiff was the result of a referral, although it does not specify the source of the referral. (R. 256.)

pain and stiffness with radiation to both buttocks and both lower extremities, and numbness and tingling in the right leg, foot and toes. (*Id*.) Plaintiff reported being unable to lift heavy objects and difficulty in rising to walk after sitting. (*Id*.) Plaintiff ranked her pain, on a scale from one to ten with ten representing the "worst pain," as eight. (*Id*.) Plaintiff stated that her pain was exacerbated by certain occurrences including "going up/down stairs, bending down, squatting, pushing, pulling, carrying objects, and prolonged standing." (*Id*.)

Dr. Nangia examined Plaintiff's cervical spine and lumbar spine and performed a neurological examination. (*Id*. at 258.) He observed that Plaintiff's "cervical muscles appear symmetrical with moderate tenderness, sharp pain and muscle spasms to the upper Trapezius and paraspinal muscles." (*Id*.) Dr. Nangia noted Plaintiff's range of motion in the cervical spine region was limited as follows: in flexion at 40 degrees (60 degrees normal), extension at 30 degrees (30 degrees normal), left rotation at 40 degrees (80 degrees normal), right rotation at 40 degrees (80 degrees normal), left lateral flexion at 20 degrees (40 degrees normal) and right lateral flexion at 20 degrees (40 degrees normal). (*Id*.) He also observed "[m]ultiple areas of sharp pain and muscle spasms along the upper and lower lumbar spines." (*Id*.) Dr. Nangia reported Plaintiff's range of motion in the lumbar spine region as follows: in flexion at 60 degrees (90 degrees normal), extension at 15 degrees (30 degrees normal), left rotation at 15 degrees (30 degrees normal), right rotation at 15 degrees (30 degrees normal), left lateral flexion at 10 degrees (20 degrees normal) and right lateral flexion at 10 degrees (20 degrees normal). (*Id*.) In the neurological examination, he observed that Plaintiff was alert, oriented and that her memory, speech and judgment were intact. (*Id*. at 258.)

Dr. Nangia found that Plaintiff's symptoms were consistent with cervical sprain/strain, cervical radiculitis, thoracic sprain/strain, lumbar sprain/strain and lumbar radiculitis. (*Id.*

at 259.)  Dr. Nangia also concluded that the January 14, 2010 work incident that Plaintiff described was the medical cause of Plaintiff's injury.  (*Id*.)  Dr. Nangia further concluded that Plaintiff has 75% temporary impairment and recommended physical therapy and chiropractic treatment, continuing pain medication (Motrin 800mg) and a follow-up visit in five to six weeks.  (*Id*.)  Dr. Nangia also recommended that "NCV and EMG nerve conduction studies of the upper and lower extremities" be conducted if symptoms persist, and that an MRI of the cervical and lumbosacral spine be conducted to rule out herniated nucleus pulposus.  (*Id*.)

Plaintiff saw Dr. Nangia again on June 2, 2010, when Dr. Nangia completed a "Doctor's Progress Report" directed to the New York Workers' Compensation Board.  (*Id*. at 305–06.)  Dr. Nangia reported that Plaintiff could not return to work because she was "unable to perform duties."  (*Id*.)  Dr. Nangia did not specify how long Plaintiff would be unable to work.  (*Id*. at 306.)  Dr. Nangia further reported the following diagnoses for Plaintiff's injuries: "brachial neuritis or radiculitis NOS," "thoracic or lumbosacral neuritis or radiculitis, unspec[ified]," "thoracic pain," and "neck sprain."  (*Id*. at 305.)  Dr. Nangia concluded that Plaintiff was 75% temporarily impaired and indicated that Plaintiff's next follow up visit was five to six weeks from that treatment date.  (*Id*.)

### 4.  Dennis Mann, D.C.

Dr. Mann, examined Plaintiff on March 30, 2010.  (R. 252.)  According to the report he prepared on that date, Dr. Mann was "asked to perform an independent chiropractic examination" of Plaintiff in connection with Plaintiff's workers' compensation claim.  (*Id*. at 252, 255.)

Plaintiff reported injuries to her head, neck and back as a result of the January 14, 2010 work incident.  (*Id*. at 252.)  Plaintiff's chief complaints at the time of the evaluation were neck

and back pain, which she indicated had worsened. (*Id*. at 253.) Plaintiff also stated that she was receiving treatment from Dr. Nangia and Dr. Mollins, which included physical and massage therapy, heat treatments and chiropractic care, and Plaintiff reported that these treatments had given her "slight temporary relief." (*Id*.) Plaintiff was taking Motrin 800 mg every day. (*Id*. at 253.) At the time of his examination, Dr. Mann had Plaintiff's Brookdale report, dated January 15, 2010, as well as a C-2 form and a C-4 form. (*Id*.)

Dr. Mann observed that Plaintiff "ambulates with a normal gait and normal posture" and was able to get on and off the examining table without difficulty. (*Id*.) Dr. Mann examined Plaintiff's cervical spine and noted that there was no "muscle spasm upon palpation bilaterally" and that Plaintiff was able to "move her neck freely," although he noted "mild tenderness upon palpation over C1, C2, C3, C4, C5, and C6." (*Id*.) Plaintiff complained of pain with "flexion, extension, right rotation and left rotation, and right lateral flexion." (*Id*. at 254.) Plaintiff's range of motion was noted "to be self restricted in flexion at 40 degrees (50 degrees normal), extension at 40 degrees (60 degrees normal), right lateral flexion at 35 degrees (45 degrees normal) and left lateral flexion at 35 degrees (45 degrees normal), and right rotation at 60 degrees (80 degrees normal) and left rotation at 60 degrees (80 degrees normal)." (*Id*. at 253–54.)

Dr. Mann also examined Plaintiff's lumbar spine and noted that there was no "muscle spasm upon palpation bilaterally" but "mild tenderness noted upon palpation over L1, L2, L3, L4 and L5 disc space levels bilaterally." (*Id*. at 254.) Dr. Mann observed that Plaintiff was "able to move her low back freely during the examination" and that her "[r]ange of motion [was] self-restricted in flexion (60 degrees normal), extension at 10 degrees (25 degrees normal), and right

lateral bending at 10 degrees (25 degrees normal) and left lateral bending at 10 degrees (25 degrees normal)." (*Id.*)

Dr. Mann determined that Plaintiff's cervical sprain/strain as well as her lumbar spine sprain/strain had been resolved. He concluded that Plaintiff's condition had reached "maximum medical improvement in . . . chiropractic," and she was not disabled and could return to work without restrictions. (*Id.* at 255.) Dr. Mann concluded that further chiropractic treatment was not reasonable, related or necessary at that time. (*Id.*)

### 5. Nigel Henry, M.D. (PHP)

On September 20, 2010, Plaintiff visited Nigel Henry, M.D., an OB/GYN physician associated with PHP. (*Id.* at 300, 302.) According to a letter dated the same day from Dr. Henry, Plaintiff was experiencing backaches since being involved "in a motor vehicle accident this year."[15] (*Id.* at 300.) Dr. Henry noted that Plaintiff had "been advised to go on modified bed rest daily," until "cleared" by a neurologist or until her symptoms improved.[16] (*Id.*)

### 6. Michael Amoashiy, M.D.

On November 29, 2010, Dr. Amoashiy, of Neurological Care P.C., performed various studies on Plaintiff including, a "motor nerve study," "sensory nerve study," and "EMG study"

---

[15] It is unclear whether Dr. Henry was referring to the January 14, 2010 work incident when he mentioned the "motor vehicle accident."

[16] It is unclear whether Dr. Henry himself advised Plaintiff to go on bed rest, or whether Dr. Henry was merely reporting that she had been so advised. The full text of Dr. Henry's letter addressed "to whom it may concern" and dated September 20, 2010, is as follows: "Ms. Elliott is currently under my professional care. She has been experiencing backaches since being involved in a motor vehicle accident this year. Consequently, she has been advised to go on modified bed rest daily until her symptoms improves and or if when cleared by her Neurologist." (R. 300.)

on Plaintiff.[17]  (*Id*. at 380–81.)  The nerve conduction study showed normal amplitudes and velocities at the bilateral peroneal and right tibial motor nerves.  (*Id*. at 381.)  Dr. Amoashiy noted that there was "low amplitude at the proximal stimulation of the left tibial nerve with normal velocity," but acknowledged that the low amplitude may have been due to technical difficulties.  (*Id*.)  Dr. Amoashiy concluded that his findings were suggestive of a "bilateral L5-S1 nerve root dysfunction without evidence of secondary axonal degeneration."  (*Id*.)

### 7.  Ammaji Manyam, M.D.

Dr. Manyam, a consultative  examiner, conducted an internal medical examination of Plaintiff on December 7, 2010.  (*Id*. at 375.)  Plaintiff complained of left knee pain, left foot pain, low back pain, neck pain right arm pain, insomnia, depression and anxiety, and trouble concentrating.  (*Id*. at 375.)  Plaintiff reported that she was receiving treatment for insomnia, depression and anxiety with her psychiatrist.  (*Id*.)  Plaintiff noted that she experienced left knee pain and left foot pain since her 2003 work-related injury and stated that she has experienced "constant pain in the left knee and left foot ever since 2003."  (*Id.*)  Plaintiff described the pain as "constant, aching" and "worse when she walks."  (*Id*.)  She rated her pain as a seven on a one to ten scale.  (*Id*.)  Plaintiff stated that her pain would lessen to a five out of ten when she takes pain medication.  (*Id*.)  Plaintiff reported taking Zoloft and Motrin.  (*Id*.)  Plaintiff's daily living activities included cooking three times a week and watching television.  (*Id*. at 376.)  Plaintiff reported that she showers and dresses everyday, but that she cannot clean much because her knees hurt when she bends.  (*Id*.)

---

[17]  Plaintiff's visit to Dr. Amoashiy was approximately two months after Dr. Henry indicated that Plaintiff was on "modified bed rest" until cleared by a neurologist.  (R. 300; *see supra* Part I.c.ii.5.)

Dr. Manyam noted that Plaintiff appeared to be in "no acute distress" and that her gait was normal, she could walk on heels and toes without difficulty, squat fully, and used no assistive devices. (*Id*.) Dr. Manyan further noted that Plaintiff "[n]eeded no help changing for exam or getting on and off the exam table" and that she was able to rise from her chair without difficulty. (*Id*.) Dr. Manyan found that Plaintiff's cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally. He further found that Plaintiff had full range of motion of shoulders, elbows, forearms, and wrists bilaterally as well as full range of motion of her hips, knees and ankles bilaterally. (*Id*. at 377.) Dr. Manyam observed that Plaintiff's joints were stable and nontender and that there was no redness, heat, swelling or effusion. (*Id*.) Dr. Manyam diagnosed Plaintiff as having a "[h]istory of back pain and pain in left knee/left foot, with no positive findings on examination," hypertension and "multiple psychiatric disorders." (*Id*.) He described Plaintiff's prognosis as good and stated that Plaintiff "has no limitations to physical activity." (*Id*. at 377–78.)

Handwritten notes on Dr. Manyam's report indicate that he ordered an x-ray of Plaintiff's cervical spine, and upon review found degenerative changes.[18] (*Id*. at 377.) This notation appears to be based on a radiologist report dated December 9, 2010, of a radiographic examination of Plaintiff's cervical spine conducted by Lawrence C. Liebman, M.D., which is included with Dr. Manyam's report. (*Id*. at 379.) In the radiologist report, Dr. Liebman concluded that there was narrowing of the C3-C4 and C4-C5 disc spaces. (*Id*.) Dr. Liebman further noted that there was straightening and no compression fracture. (*Id*.) He concluded that there were degenerative changes in Plaintiff's cervical spine. (*Id*.)

---

[18] Dr. Manyam's December 7, 2010 notes state "xray c-spine – degn. changes." (R. 377.)

### 8. Anthony Ezeagbor, M.D. (PHP)

Plaintiff saw Dr. Ezeagbor after the alleged onset date of her disability at least once. (*Id.* at 291–92.) On February 22, 2010, Plaintiff saw Dr. Ezeagbor for a follow up visit and to have some "paper[s]" filled out. (*Id.* at 291.) In his report of the visit, Dr. Ezeagbor notes that Plaintiff has a history of anxiety and adjustment disorder, but that there were "[n]o mood changes or emotional disturbances" and that Plaintiff was "[c]onsolable" and "[a]ppropriately interactive." (*Id.*) The results of Dr. Ezeagbor's physical exam were normal. (*Id.*)

### 9. Leonard Kingsley, Ph.D

According to an August 18, 2010 "Attending Physician Statement," Dr. Kingsley first treated Plaintiff on July 19, 2010, and subsequently treated her on August 18, 2010.[19] (*Id.* at 307.) This statement is included with the treatment records produced from PHP but there is no other indication that Dr. Kingsley is affiliated with PHP.[20]

On this form, Dr. Kingsley reported that Plaintiff was diagnosed with depression and borderline personality disorder. (*Id.*) He saw Plaintiff "weekly" and at that time, Plaintiff had not "reached a point of maximum medical improvement." (*Id.*) He did not advise Plaintiff to stop working but Plaintiff had already been so advised by Dr. Ezeagbor.[21] (*Id.*) Although

---

[19] Dr. Kingsley's Attending Physician Statement is a one-page document that appears to have been part of a set of other documents that are not before the Court; the page number at the bottom of the document indicates that it is page five of eight. (R. 307.)

[20] (*See* Court Transcript Index, Docket Entry No. 5 at ECF No. 3 (describing set of documents identified as Exhibit No. 2F, which includes Dr. Kingsley's Attending Physician Statement as "Office Treatment Records, dated 10/22/2009 to 09/20/2010 from Preferred Health Partners").)

[21] There is no other indication in the record that Dr. Ezeagbor advised Plaintiff to stop working, but Plaintiff "had been advised to go on modified bed rest daily until her symptoms improves and or if when cleared by her Neurologist." (R. 300.)

Dr. Kingsley wrote "N/A at this time" in response to whether Plaintiff had any work or activity restrictions, he did not advise Plaintiff to return work, noting that "psychotherapy [had] just begun." (*Id*.)

By letter dated September 22, 2010, Dr. Kingsley wrote to the "Human Resources Administration," stating that Plaintiff had begun psychotherapy treatment with him on a "once-a-week basis," and that they could contact him if they needed further information.[22] (*Id*. at 226.) A copy of this letter appears to have been submitted to the New York State Office of Temporary and Disability Assistance, Division of Disability Determinations on December 9, 2010, as part of Plaintiff's "Work History Report," which details Plaintiff's job history and responsibilities.[23] (*Id*. at 215–226.)

### 10. Michelle Bornstein, Psy. D.

Dr. Michelle Bornstein conducted a consultative psychiatric evaluation of Plaintiff on December 7, 2010. (*Id*. at 308–311.) As part of the evaluation, Dr. Bornstein took a psychiatric history of Plaintiff and found that she had no history of psychiatric hospitalization but had been

---

[22] The full text of Dr. Kingsley's September 22, 2010 letter reads as follows: "Dear sirs: With Ms. Elliott's permission, I am writing to you to indicate that she has begun psychotherapy with me on a once-a-week basis. Please contact me if you wish further information." (R. 226.)

[23] It is not clear whether a copy of Dr. Kingsley's letter was previously submitted as part of Plaintiff's disability claim. A "Disability Worksheet," was submitted to the Court which, according to the Defendant, "documents the effort that the State agency made to develop evidence relating to Plaintiff's claim." (Def. Reply 2 (citing R. 366).) Defendant states that the Disability Worksheet indicates that the social security agency submitted an initial request for information and records to Dr. Kingsley on September 8, 2010, and two follow-up requests on September 30, 2010, and October 18, 2010, but did not receive a response from him. The Court has reviewed the Disability Worksheet and while it does list, among other treating sources, Dr. Kingsley's name and the dates September 8, 2010, September 30, 2010, and October 18, 2010, it does not explain the purpose of these notations. For the purposes of this motion, the Court credits the Defendant's interpretation of this document. Because Dr. Kingsley's letter is dated September 22, 2010, it is likely that it was submitted in response to one of the requests for information and records which were sent by the social security agency.

prescribed Zoloft by her primary care physician and had been seen by a psychologist since 2007. (*Id*. at 308.) Dr. Bornstein noted that Plaintiff failed to take the Zoloft as prescribed. (*Id*.) Dr. Bornstein also noted that Plaintiff had difficulty falling asleep and gained 50 pounds. (*Id*.) Plaintiff admitted experiencing "dysphoric moods, crying spells, loss of usual interests, irritability and social withdrawal." (*Id*.) Dr. Bornstein noted that Plaintiff denied "suicidal ideation, plan or intent and that there was no evidence or report of anxiety, panic attacks, manic symptoms, thought disorder symptoms or cognitive deficits." (*Id*.)

Dr. Bornstein observed that Plaintiff was cooperative and displayed an adequate manner of relating, adequate social skills and overall presentation. (*Id*. at 309.) Dr. Bornstein observed that Plaintiff's thought process was "coherent and goal oriented," her affect was "dysphoric and somewhat irritated," mood was dysthymic and her motor behavior was "lethargic." (*Id*.) Dr. Bornstein found that Plaintiff's attention and concentration was intact, noting that Plaintiff completed serial 3s, simple calculations and counting. (*Id*.) She also found Plaintiff's cognitive function to "fall in at least the low-average range" and noted that Plaintiff's fund of information appeared to be limited. (*Id*.) Dr. Bornstein further observed Plaintiff's insight and judgment to be "good." (*Id*.)

Dr. Bornstein noted that Plaintiff can dress, bathe, groom, cook, manage money and take public transportation. (*Id*.) Plaintiff did not do any cleaning, laundry, or shopping, and was helped in these areas by her sister, mother and daughter. Plaintiff spends most of her time at home trying to sleep, but she has a boyfriend. (*Id*.)

Dr. Bornstein diagnosed Plaintiff with major depressive disorder, moderate and left knee, left foot, lower back, neck and right arm pain, high blood pressure, dizziness and fatigue. (*Id*. at 310.) Dr. Bornstein concluded that Plaintiff could follow and understand simple directions

and instructions, perform simple tasks independently, maintain attention and concentration, and maintain a regular schedule and learn new tasks. (*Id*.) Dr. Bornstein noted that Plaintiff will need supervision performing complex tasks but that she can make decisions appropriately, "relates adequately with others and appropriately deal with stress." (*Id*.) Dr. Bornstein recommended that Plaintiff take her psychiatric medications as prescribed and continue with her individual psychological therapy. (*Id*. at 311.) She concluded that Plaintiff's prognosis was "fair to guarded." (*Id*.)

## 11. J. Belsky[24]

On December 20, 2010, J. Belsky, a psychiatric medical consultant for the State agency, determined that Plaintiff's psychiatric impairment was not severe. (*Id*. at 350.) According to the report prepared by Dr. Belsky, Dr. Belsky assessed Plaintiff's mental impairment under Rule 12.04 for Affective Disorders. (*Id*. at 352.) Dr. Belsky concluded that there were no restrictions of Plaintiff's daily living activities, Plaintiff had mild difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no history of repeated episodes of deterioration. (*Id*. at 362.)

### iii. Other evidence

#### 1. Investigative report by New York City Transit Authority

The record contains an investigative report dated July 18, 2008, prepared by Mark S. Neadel, Chief Officer of Special Investigations & Review at New York City Transit Authority, Plaintiff's prior employer, regarding a 2008 investigation into allegations of inappropriate

---

[24] Dr. Belsky's first name is not included in the record.

behavior by Plaintiff.[25]  (*Id*. at 315–48.)  The report indicates that Plaintiff was involved in two incidents at work, on April 16, 2007, and November 26, 2007.  (*Id.* at 315.)  The report concluded that while Plaintiff engaged in "inappropriate behavior" during these incidents, the investigators were "not certain whether [Plaintiff] was fully in control of her actions at these times."  (*Id*. at 347.)  According to the report, on the date of both incidents, Plaintiff was subject to an Independent Medical Examination evaluation which had "assigned her a restricted duty status precluding her from working indoors or outdoors as a [Transit Property Protection Agent ("TPPA")]."  (*Id*.)  The report concluded that Plaintiff "could not be held accountable for her inappropriate conduct."  (*Id*.)  The report further noted that investigators observed "irrational" behavior by Plaintiff during interviews which "caused [them] to remain concerned with her ability to perform the duties of a TPPA."  (*Id*. at 348.)

### iv.  Appeals Council

Records from Safe Horizon and Dr. Edward Rozner of PHP were included in the record filed with the Appeals Council.  (*Id*. at 4.)  These documents were not presented to the ALJ.  (*Id*. at 28–30.)

### 1.  Safe Horizon

Medical records from Safe Horizon indicates that Plaintiff was treated at the facility between June 15, 2012 and July 6, 2012 for obesity, chronic pain syndrome, unspecified episodic mood disorder, cannabis abuse, alcohol abuse, borderline personality disorder and antisocial personality disorder.  (*Id*. at 399–402.)  The records do not provide any specific information regarding Plaintiff's symptoms or treatment at Safe Horizon.

---

[25]  The report is also signed by investigators, Robert Frierir, Thomas Cappiello, and Paul Robinson, as well as investigation managers, Rubin Salz and Linda Wilson, (R. 348), and is addressed to Vincent DeMarino, Vice President, Department of Security and John Johnson, Chief Transportation Officer, Department of Subways, (*id*. at 315).

### 2. Edward Rozner (PHP)

On August 13, 2012, Edward Rozner completed a form assessing Plaintiff's physical abilities to perform work-related activities based on Plaintiff's self-reporting of her limitations.[26] (*Id*. at 408–411.)   In this form, Rozner opined that Plaintiff can perform "light work."[27]  (*Id*. at 408.)  Rozner noted that Plaintiff's maximum ability to lift and carry on an occasional basis is 10 pounds, her maximum ability to lift and carry on a frequent basis is 10 pounds and her maximum ability to stand and walk with breaks is three hours.  (*Id*. at 409.)  Rozner also noted that Plaintiff can sit for sixty minutes before needing to change positions, and could stand for 30 minutes before changing positions.  (*Id*.)  Rozner further noted that Plaintiff will need the opportunity to shift at will from sitting or standing/walking and may need to lie down at unpredictable intervals during a work shift.  (*Id*. at 410.)

### d. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act.  First, the ALJ found that Plaintiff had not engaged in substantial activity since January 15, 2010, the alleged onset date.  (*Id*. at 20.)  Second, the ALJ found that Plaintiff had the following severe impairments: "degenerative changes of the cervical spine with a history of back pain; left knee pain and left foot pain; bilateral L5-S1 nerve foot dysfunction; hypertension, and major depressive disorder moderate."

---

[26]  This form is the only evidence in the record of Plaintiff's treatment with Edward Rozner, though he is affiliated with PHP, the facility Plaintiff visited several times throughout 2005–2007 and 2009–2010.  It is unclear whether this form was prepared for submission to the Appeals Council since the form post-dates the ALJ's hearing and his decision.

[27]  Light work is defined on this form as including the ability to "[e]xert[] up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects," and the ability to walk or stand to a significant degree or when sitting, to push and/or pull arm or leg controls.  (R. 408.)

(*Id.*)  The ALJ found that these impairments "result in limitations that significantly affect [Plaintiff's] ability to perform basic work activities" and therefore, are severe.  (*Id.*)  Third, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in Appendix 1 of the Social Security Regulations.  (*Id.* at 21.)  The ALJ considered Listing 1.04 for disorder of the spine, Section 4.00 for hypertension, and Listing 12.04 for affective disorder.

Regarding Listing 1.04, which addresses disorders of the spine and Section 4.00, which considers the cardiovascular system, the ALJ found that there was insufficient medical evidence that Plaintiff's impairments met the criteria of these listings.  (*Id.*)  With respect to Listing 12.04, the ALJ determined that Plaintiff's mental impairment did not meet the requirement of demonstrating at least two of the criteria under "paragraph B,"[28] which consist of (1) marked restrictions of daily living activities, (2) marked difficulties in maintaining social functioning, (3) marked difficulties in maintaining concentration, persistence, or pace, or (4) repeated episodes of decompensation of extended duration.  (*Id.*)  In reaching this conclusion, the ALJ found that Plaintiff has "mild restriction" in daily living activities and "mild difficulties" in social functioning.  (*Id.*)  The ALJ determined that Plaintiff has moderate difficulties with regard

---

[28]  To meet the criteria under "paragraph B," "a claimant must show that his condition results in at least two of the following: (1) [m]arked restriction of activities of daily living; or (2) [m]arked difficulties in maintaining social functioning; or (3) [m]arked difficulties in maintaining concentration, persistence, or pace; or (4) [r]epeated episodes of decompensation, each of extended duration." *Fortier v. Astrue*, No. 09-CV-993, 2010 WL 1506549, at *15 (S.D.N.Y. Apr. 13, 2010) (citing 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.04(B)).  Marked means "more than moderate but less than extreme." *Id.*  (citing 20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(C)).  "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintain concentration, persistence or pace." *Kohler v. Astrue*, 546 F.3d 260, 266 n.5 (2d Cir. 2008) (quoting United States Social Security Administration, Disability Evaluation Under Social Security § 12.00 (June 2006), *available at* http://www.ssa.gov/disability/professionals/bluebook/12.00-MentalDisorders-Adult.htm.)

to concentration, persistence or pace, noting that during her evaluation with Dr. Bornstein, Plaintiff could perform serial 3s, simple calculations and counting, though the ALJ also acknowledged that Dr. Bornstein believed that Plaintiff would need supervision to perform complex tasks.  (*Id*. at 22.)  The ALJ also found that Plaintiff has not experienced any episodes of decompensation of extended duration, though Plaintiff has a history of treatment with a psychologist since 2007 and has been prescribed Zoloft, which Plaintiff admits that she does not take as prescribed.  (*Id*. at 22.)   The ALJ also considered whether the criteria under "paragraph C" of Listing 12.04[29] were satisfied and concluded that they were not, finding no evidence that Plaintiff "suffers from repeated episodes of decompensation, that any marginal adjustment or minimal demands or change in the environment would cause decompensation, or a current history of one or more years' inability to function outside a highly supporting living arrangement.  (*Id*. at 22.)

Fourth, the ALJ determined that Plaintiff "has the residual functional capacity to perform the full range of light work except that [she] is limited to performing tasks of moderate complexity"  and that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms."  (*Id*. at 22–23.)  The ALJ also determined that "the claimant's

---

[29]  Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
> 1.  Repeated episodes of decompensation, each of extended duration; or
> 2.  A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3.  Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04(C).

statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent with the above residual function capacity assessment." (*Id*. at 23.) In reaching this conclusion, the ALJ accorded strong weight to Dr. Manyam's and Dr. Bornstein's opinions, noting that Dr. Manyam opined that Plaintiff did not have any limitations to physical activity, and that Dr. Bornstein found that Plaintiff was cooperative with adequate social skills, able to follow and understand directions, make appropriate decisions, and relate well with others, among other tasks. (*Id*. at 25.) The ALJ noted that Dr. Bornstein did find that Plaintiff's "motor behavior was lethargic." (*Id*.)

The ALJ also recognized the medical findings of Dr. Nangia, Dr. Mann, and Dr. Amoashiy. The ALJ noted that based on her examination, Dr. Nangia found that Plaintiff had a 75% temporary impairment, but the ALJ further noted that "two months later," Dr. Mann found "from a chiropractic point of view" that Plaintiff was "not disabled at that time and was able to work without any restrictions." (*Id*. at 24.) The ALJ described the results of Dr. Amoashiy's electromyogram and nerve conduction studies as revealing "normal amplitudes and velocities at the bilateral peroneal and right tibial motor nerves and low amplitude at the proximal stimulation of the left tibial nerve with normal velocity." (*Id*. at 25.) The ALJ noted that Dr. Amoashiy remarked that the low amplitude "may be due to technical difficulties" but Dr. Amoashiy concluded that his "findings were suggestive of a bilateral L5-S1 nerve root dysfunction without evidence of secondary axonal degeneration." (*Id*.)

Finally, the ALJ determined that based on Plaintiff's residual functional capacity for the full range of light work, and in consideration of Plaintiff's age, education and work experience, there are a significant number of jobs in the national economy that Plaintiff could perform. (*Id*. at 26.)

## II.     Discussion

### a.  Standard of Review

In reviewing a final decision of the Commissioner, a district court must determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175–76 (2d Cir. 2013) (per curiam) (quoting *Kohler v. Astrue*, 546 F.3d 260, 264–65 (2d Cir. 2008)); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam).  Substantial evidence requires "more than a mere scintilla." *Selian*, 708 F.3d at 417 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Burgess v. Astrue*, 537 F.3d 117, 127 (2d Cir. 2008)).  "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian*, 708 F.3d at 417 (citation and internal quotation marks omitted).  Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted).  In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012).  The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted).  If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998); *see Box v. Colvin*, --- F. Supp. 2d ---, ---, 2014 WL 997553, at *13 (E.D.N.Y. Mar. 14, 2014) ("When reviewing the decision of the Commissioner, the Court may set aside the determination only if the decision was based on legal error or was not supported by substantial evidence in the administrative record.").

"The Act must be liberally applied, for it is a remedial statute intended to include not exclude." *Moran*, 569 F.3d at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Social Security Act (the "Act"). To be eligible for disability benefits under the Act, the plaintiff must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler*, 546 F.3d at 265 (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c. Analysis

Defendant moves for judgment on the pleadings, arguing that the ALJ correctly evaluated the medical evidence and correctly determined Plaintiff's credibility. (Def. Mem. 21–27.) Defendant further argues that there are jobs in the national economy that Plaintiff could perform. (*Id*. at 28.) Plaintiff cross-moves for judgment on the pleadings, arguing that (1) the ALJ erred in failing to obtain any of the records from Plaintiff's treating psychologist, Dr. Kingsley, (2) the ALJ did not properly evaluate Plaintiff's credibility, (3) the ALJ's finding is not supported by substantial evidence, and (4) the Commissioner failed to sustain her burden of demonstrating that there are other jobs in the national economy that Plaintiff can perform because vocational expert testimony was needed to make that determination. (Pl. Opp. 1.)

### i. Treating physician rule and the duty to develop the record

Plaintiff argues that the ALJ erred by failing to obtain additional records from Plaintiff's treating psychologist, Dr. Kingsley, who offered to provide further information in a letter dated September 22, 2010. (Pl. Opp. 11–13.) Defendant argues that the ALJ was not required to develop the medical record further, noting that the SSA sent an initial request for information and records to Dr. Kingsley and two follow up requests. (Def. Reply 2.) Defendant also claims that there are no obvious gaps in the medical record requiring the ALJ to seek additional information. (*Id.* at 3.) For the reasons set forth below, the Court finds that the ALJ failed to develop the record by not requesting additional information from Dr. Kingsley.

"A treating physician's statement that the claimant is disabled cannot itself be determinative." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012).

But a treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (discussing treating physician rule). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors in determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129); *see also Halloran*, 362 F.3d at 32 (discussing the factors). The ALJ must set forth the reasons for the weight he or she assigns to the treating physician's opinion. *Halloran*, 362 F.3d at 32. The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was

undertaken.  *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33.

Before determining whether the Commissioner's decision is supported by substantial evidence, the court "must first be satisfied that the claimant has had a full hearing under the regulations and in accordance with the beneficent purposes of the Act."  *Moran*, 569 F.3d at 112 (alterations omitted) (quoting *Cruz*, 912 F.2d at 11); *see also Perez*, 77 F.3d at 47 ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").  The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to give the treating physician's opinion.[30]  *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record."  (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. March 22, 2013) (remanding for failure to develop the record); *Hinds v. Barnhart*, No. 03-CV-6509, 2005 WL 1342766, at *10 (E.D.N.Y. Apr. 18, 2005) ("The requirement that an ALJ clarify a treating source's opinion that a claimant is unable to work is part of the ALJ's affirmative obligation to develop a claimant's medical history.");

---

[30]  The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel."  *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order).

*Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))). "Because of the considerable weight ordinarily accorded to the opinions of treating physicians, an ALJ's duty to develop the record on this issue is 'all the more important.'" *Rocchio v. Astrue*, No. 08-CV-3796, 2010 WL 5563842, at *11 (S.D.N.Y. Nov. 19, 2010) (citation omitted), *report and recommendation adopted*, No. 08-CV-3796, 2011 WL 1197752 (S.D.N.Y. Mar. 28, 2011). An ALJ's "failure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) (citing *Moran*, 569 F.3d at 114–15), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012).

The Court finds that the ALJ failed to develop the record as it relates to Plaintiff's mental impairment. The ALJ concluded that Plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.04. (R. 21.) In reaching this conclusion, the ALJ accorded strong weight to the consultative psychiatrist's opinion, Dr. Bornstein, as consistent with clinical findings and the evidence in the record. (*Id*. at 25.) However, the ALJ appeared to only consider Dr. Bornstein's opinion in determining Plaintiff's mental impairment and her ability to work. The ALJ did not reference Plaintiff's treatment with her psychiatrist, Dr. Kingsley, nor her prior treatment with Dr. Ezeagbor for her depression, even though based on the record before him, the ALJ was aware that Plaintiff received psychotherapy treatment from both doctors within the relevant time period.

Plaintiff started psychotherapy treatment with Dr. Kingsley in July 2010, (*Id.* at 307), and had been seeing him weekly from August 8, 2010, through September 22, 2010, (*id*. at 226). Because Plaintiff received ongoing psychotherapy treatment from Dr. Kingsley, he qualifies as a treating source. *See* 20 C.F.R. § 404.1502 (defining a treating source as plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]"); *see also Bailey*, 815 F. Supp. 2d at 597 (same). There is very little information in the record regarding Plaintiff's treatment with Dr. Kingsley resulting in "clear gaps" in Plaintiff's medical history that the ALJ was obligated to fill.

The only substantive information in the record about Plaintiff's treatment with Dr. Kingsley are two one-page documents, neither of which were referenced by the ALJ: (1) an "Attending Physician's Statement" dated August 18, 2010, and (2) Dr. Kingsley's September 22, 2010 letter offering to provide additional information. (R. 226, 307.) In the Attending Physician's Statement, Dr. Kingsley states that Plaintiff suffers from depression and borderline personality disorder, with symptoms first appearing in December of 2007. (*Id.* at 307.) Dr. Kingsley did not opine on Plaintiff's ability to work, noting that she was already advised by Dr. Ezeagbor to cease working. (*Id.*) Dr. Kingsley also noted that he had not advised Plaintiff to return to work because "psychotherapy [had] just begun." (*Id.*) Dr. Kingsley further noted that Plaintiff had not reached a point of maximum medical improvement. (*Id.*) By letter dated September 22, 2010, Dr. Kingsley stated that he was seeing Plaintiff on a once a week basis and indicated that he was available to provide additional information, if needed. (*Id.* at 226.)

The record does not contain any treatment notes or other documents providing details of Dr. Kingsley's treatment of Plaintiff or of Dr. Kingsley's impression of her condition. There is

no information as to the severity of Plaintiff's mental impairment or an assessment of her residual functioning capacity. In order to satisfy his threshold duty to develop the record, the ALJ had a clear obligation to obtain an opinion from Plaintiff's treating sources, including Dr. Kingsley. *See Pabon*, 273 F. Supp. 2d at 514 ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability."); *Dimitriadis v. Barnhart*, No. 02-CV-9203, 2004 WL 540493, at *9–10 (S.D.N.Y. Mar. 17, 2004) ("[T]he ALJ must obtain the treating physician's opinion regarding the claimant's alleged disability."). Moreover, where, as here, "a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop [the record] requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity." *Marshall v. Colvin*, No. 12-CV-6401T, 2013 WL 5878112, at *9 (W.D.N.Y. Oct. 20, 2013) (citations omitted); *Santos v. Barnhart*, No. 10-CV-444, 2005 WL 119359, at *8 (E.D.N.Y. Feb. 15, 2005) ("The ALJ fell short of discharging his duty to develop the record because the record shows no attempt to contact the treating physician for an assessment of the claimant's impairments and their impact on the relevant facts."). Accordingly, the ALJ failed to adequately develop the record with regard to Plaintiff's mental impairment. In particular, the ALJ should have contacted Dr. Kingsley to obtain an opinion as to the severity of Plaintiff's mental condition and as to her residual functioning capacity. Failure to develop the administrative record in this regard requires remand. *See Rosa*, 168 F.3d at 80 (finding legal error in light of "scant record [which] reveals a host of lost opportunities for the ALJ to have developed the facts of th[e] case").[31]

---

[31] Moreover, the ALJ's duty to develop the record was heightened in light of Plaintiff's alleged psychiatric impairment. *Sanchez v. Comm'r of Soc. Sec.*, No. 13-CV-3270, 2014 U.S. Dist. LEXIS 115153, at *40–41 (S.D.N.Y. Aug. 15, 2014) ("The ALJ's duty to develop the record is heightened when the disability in question is a psychiatric impairment."); *Camilo v. Comm'r of the Soc. Sec. Admin.*, No. 11-CV-1345, 2013 WL 5692435, at * 22 (S.D.N.Y. Oct. 2,

The Court rejects the Defendant's argument that the ALJ 's duty to develop the record was discharged by the SSA's initial and follow up requests to Dr. Kingsley for information and records. The Court reaches this conclusion in light of Dr. Kingsley's September 22, 2010 letter offering to provide additional information.[32] (R. 226.) This letter, though addressed to the "Social Security Administration," was submitted with Plaintiff's Work History Report to be considered as part of her disability claim. Because of Dr. Kingsley's explicit offer to provide additional information if needed, the Court discredits Defendant's suggestion that Dr. Kingsley was an "uncooperative" source. (Def. Reply 2.) An ALJ may be required to re-contact a treating

---

2013) ("[I]t is the ALJ's duty to develop the record and resolve any known ambiguities, and that duty is enhanced when the disability in question is a psychiatric impairment."). The Regulations recognize that, particularly with respect to an alleged mental impairment, a review of "all pertinent information" is "vital" to a disability determination:

> Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs. In such a case, you may be much more impaired for work than your symptoms and signs would indicate. The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).

[32] The Court acknowledges that Dr. Kingsley's letter is dated almost two years before the ALJ rendered his decision. At the time of Plaintiff's hearing before the ALJ, she did not indicate that she was still treating with Dr. Kingsley or any other psychiatrist, and the record does not indicate how long Dr. Kingsley treated Plaintiff. However, the record does demonstrate that Plaintiff saw Dr. Kingsley after the onset date of her disability, and thus within the relevant period, and his medical opinion as to Plaintiff's ability to work is therefore relevant to the ALJ's decision and should have been considered. *See Shaw v. Carter*, 221 F.3d 126, 134 (2d. Cir. 2000) ("For the ALJ to conclude that plaintiff presented no evidence of disability at the relevant time period, yet to simultaneously discount the medical opinion of his treating physician, violates his duty to develop the factual record, regardless of whether the claimant is represented by counsel." (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d. Cir. 1998) and *Pratts v. Chater*, 94 F.3d 34, 37 (2d. Cir. 1996))).

source under certain circumstances in order to fulfill the ALJ's duty to develop the record. *See Neger v. Colvin*, No. 13-CV-1858, 2014 WL 3845379, at *10 (E.D.N.Y. Aug. 5, 2014) ("[T]he ALJ has the duty to recontact a treating physician for clarification if the treating physician's opinion is unclear. Such an obligation is linked to the ALJ's affirmative duty to develop the record." (citations and internal quotation marks omitted)); *Torees v. Barnhart*, No. 02-CV-9209, 2007 WL 1810238, at *11 (S.D.N.Y. June 25, 2007) ("If the ALJ obtains a report from a treating physician that is ambiguous or incomplete, the ALJ must make diligent efforts to supplement and clarify the information." (citing cases)); *Geracitano v. Callahan*, 979 F. Supp. 952, 956 (W.D.N.Y. 1997) ("[T]he ALJ had a responsibility to seek clarifying information from [treating physician].");  *cf. Lowry ex rel T.B. v. Astrue*, 474 F. Appx 801, 804 (2d Cir. 2012) (no breach of failure to develop record where the ALJ re-contacted treating physician and obtained an assessment of the plaintiff's condition).

Where, as here, an ALJ fails to adequately develop the record in reaching a conclusion on a claimant's residual functional capacity, the Court is unable to review whether the ALJ's denial of benefits was based on substantial evidence. *Mantovani v. Astrue*, No. 09-CV-3957, 2011 WL 1304148, at *4 (E.D.N.Y. Mar 31, 2011) (Where the ALJ fails to develop the record, "the Court need not — indeed, cannot — reach the question of whether the [ALJ's] denial of benefits was based on substantial evidence."); *Jones v. Apfel*, 66 F. Supp. 2d 518, 542 (S.D.N.Y. 1999). Instead, where the ALJ has failed to fully develop the factual record, the proper remedy is to remand the case for further proceedings. *Mantovani*, 2011 WL 1304148, at *4; *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004). Accordingly, this case must be remanded pursuant to 42 U.S.C. § 405(g) for the ALJ to contact Dr. Kingsley to determine the nature, extent and severity of Plaintiff's mental impairment and what, if any, limitations are imposed by her alleged

mental impairment.

### ii. RFC determination

Plaintiff argues that the ALJ's RFC finding is not supported by substantial evidence in the record. (Pl. Mem. 18.) According to Plaintiff, the record is "devoid of any evidence" supporting the ALJ's finding that Plaintiff can perform the full range of light duty work and none of the physicians who treated or evaluated Plaintiff opined that Plaintiff can perform light duty work. (*Id*. at 18, 23.) Because the Court finds that the ALJ failed to develop the record as it relates to Plaintiff's alleged mental impairments, and remands the case for further factual development in this regard, *see supra* Part II.c.i, the Court cannot reach the question of whether the ALJ's RFC determination as to Plaintiff's mental impairment was based on substantial evidence. *See Mantovani*, 2011 1304148, at *4. Thus, the Court only considers this argument as it relates to Plaintiff's alleged physical impairment.

An RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations. 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, an RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. 20 CFR 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing, walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*. In determining the RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." *Stover v. Astrue*, No. 11-CV-172, 2012 WL 2377090, at *6

(S.D.N.Y. Mar. 16, 2012) (citing *Mongeur*, 722 F.2d at 1037).

The ALJ determined that Plaintiff could perform the "full range of light duty work." (R. 22.) In reaching this RFC finding, the ALJ accorded strong weight to Dr. Manyan's opinion, noting that Dr. Manyan concluded in December 2010, that Plaintiff "did not have any limitations to physical activity . . . ." (*Id*. at 25.) The ALJ also acknowledged, but did not accord specific weight to, Dr. Nangia's opinion, who upon evaluating Plaintiff in January 2010, shortly after the alleged onset date, found that Plaintiff had "significantly limited range of motion of both the cervical and lumbar spine and a 75% temporary impairment." (*Id*. at 24.) The ALJ also noted that Plaintiff sought treatment from a chiropractor, Dr. Mann, in March 2010, who found that Plaintiff was not disabled at the time and could work without restrictions. (*Id*.)

The ALJ's RFC determination, as it relates to Plaintiff's physical impairments, was not performed adequately. The ALJ determined that Plaintiff has the RFC to "perform the full range of light work as defined in 20 CFR 404.1567(b), except that [she] is limited to performing tasks of moderate complexity, defined as work requiring frequent decision-making." (*Id*. at 22.) Light duty work is defined as that which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weight up to 10 pounds," and "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." *Lewis v. Colvin*, 548 F. App'x 675, 677 n.5 (2d. Cir. 2013) (citing 20 C.F.R. 416.967(b)). "To be considered capable of performing full or wide range of light work, [a claimant] must have the ability to do substantially all of these activities." *Id*. In addition, "[b]efore an ALJ classifies a claimant's RFC based on exertional levels of work (*i.e.* whether the claimant can perform sedentary, light, medium, heavy or very heavy work) he must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities

on a function-by-function basis." *Cichocki*, 729 F.3d at 176 (citation and internal quotation marks omitted). Social Security Ruling 96-8p notes that "a failure to first make a function-by-function assessment of the individual's limitations or restrictions could result in the adjudicator overlooking some of an individual's limitations or restrictions." *Id.* at 176. The Second Circuit has held that failure to conduct an explicit function by function analysis at the RFC finding step is not *per se* error requiring remand. *Id.* at 177. However, the Second Circuit has reiterated that "remand may be appropriate, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record." *Id.* This is precisely the error committed in this case.

With respect to Plaintiff's physical impairments, the ALJ considered the opinions of four medical sources: consultative examiner, Dr. Manyan, referred neurologist, Dr. Nangia, consultative chiropractor examiner, Dr. Mann, and Dr. Amoashiy. The ALJ accorded strong weight to Dr. Manyan's opinion, and did not specify the degree to which he considered the remaining opinions. Dr. Manyan found upon his examination that Plaintiff had a normal gait, was in no acute distress, could walk on her heels and toes without difficulty, could perform a full squat, and used no assistive devices and was able to rise from her chair without difficulty. (R. 376.) An examination of Plaintiff's cervical spine showed full flexion and extension, full range of motion of her shoulders, elbows, forearms and wrists, and full range of motion of her hips, knees and ankles. (*Id*. at 377.) However, Dr. Manyan's opinion did not directly assess Plaintiff's ability to lift objects of up to 20 pounds, or to walk or sit for the duration expected of a light duty position. Dr. Manyan did conclude that Plaintiff did not have any limitations to physical activity, but such a generic conclusion, without any evidence in the record as to what Dr. Manyan meant by "physical activity," and whether this conclusion encompasses the activities

40

required of a light duty position, does not provide direct support for the ALJ's RFC finding. *See Ubiles v. Astrue*, No. 11-CV-6450T, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (noting that medical opinion stating that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights" is "too vague to serve as a proper basis for an RFC"). Similarly, Dr. Amoashiy concluded that his findings were "suggestive of a bilateral L5-S1 nerve root dysfunction without evidence of secondary axonal degeneration," (R. 381), but did not opine as to Plaintiff's ability to work or engage in certain physical activity. In addition, Dr. Mann concluded that "[f]rom a chiropractic point of view, [Plaintiff] is not disabled . . . and is able to work without any restrictions." (*Id*. at 255.)

The only medical evidence in the record that explicitly considers Plaintiff's ability to sit, walk, or stand for a prolonged period of time or to push, pull or lift are records from Dr. Nangia and Dr. Rozner, which records directly conflict with the conclusions reached by Dr. Manyan and Dr. Mann that Plaintiff did not have any limitations as to physical activity. Dr. Nangia determined in January 29, 2010, that Plaintiff had a 75% temporary impairment and noted that her pain was exacerbated by going up/down stairs, bending down, squatting and lying down, pushing pulling and lifting, carrying heavy objects, prolonged standing, sitting and walking, and standing up from a sitting position. (*Id*. at 256.) Rozner noted, among other limitations, that Plaintiff could carry only up to 10 pounds, could sit, stand and walk for about 3 hours a day with breaks, and that Plaintiff would need to lie down at unpredictable intervals during a work shift.[33] (*Id*. at 409–410.) In reaching the conclusion that Plaintiff could perform light duty work as defined by the Social Security regulations, the ALJ presumably rejected the opinions of Dr. Nangia and Dr. Rozner as to Plaintiff's limitations. The ALJ's failure to address the apparent

---

[33] Rozner indicated that his findings were based on Plaintiff's self-reporting. (R. 410.)

conflicts between the opinions of Dr. Nangia and Dr. Manyan's with respect to Plaintiff's physical limitations undermines the Court's review of the ALJ's decision. *See Box*, --- F. Supp. 2d at ---, 2014 WL 997553, at *19 (finding that ALJ's failure to address the plaintiff's RFC with respect to specific relevant functions, i.e. whether plaintiff could lift 20 pounds or 10 pounds, and failure to address conflict of opinions prevented the court from evaluating the reasons for the ALJ's assessment and remanding the case so that the ALJ could explain the reasons for his RFC assessment); *see also Glessing v. Comm'r of Social Security*, No. 13-CV-1254, 2014 WL 1599944, at *9 (E.D.N.Y. Apr. 21, 2014) ("Although the ALJ was not required to engage in a detailed analysis of every possible limitation, he was required to analyze the relevant ones, particularly those for which there was conflicting medical evidence in the record."). The Court remands this case for the ALJ to fully explain the reasons for his RFC assessment, including a discussion as to Plaintiff's ability to perform the relevant functions.

### iii. Remaining arguments

Plaintiff argues that the ALJ did not properly evaluate Plaintiff's credibility and failed to obtain vocational expert testimony to identify what jobs, if any, Plaintiff could perform given her limitations. (Pl. Mem. 13, 23.) Because the Court remands this case for further development of the record as to Plaintiff's mental impairment and for further explanation of the ALJ's RFC assessment to determine whether it is supported by substantial evidence, the Court is unable to consider Plaintiff's remaining arguments as both of the errors identified impact the Court's review of Plaintiff's remaining arguments.

**III.    Conclusion**

For the reasons outlined above, Defendant's motion for judgment on the pleadings is

denied.  The Commissioner's decision is vacated and this action is remanded for further

administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of

Court is directed to close this case.

SO ORDERED:

        s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: September 24, 2014
       Brooklyn, New York